## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 23 2020, 10:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>M.F., P.F., L.F., & D.F. (Minor Children)<br><br>and<br><br>J.F. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | June 23, 2020<br><br>Court of Appeals Case No. 20A-JT-293<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Kimberly S. Dowling, Judge<br><br>Trial Court Cause Nos. 18C02-1903-JT-78, 18C02-1903-JT-79, 18C02-1903-JT-80, 18C02-1903-JT-81 |

**Altice, Judge.**

## Case Summary

Father appeals from the involuntary termination of his parental rights to four of his children. He challenges the sufficiency of the evidence supporting the termination.

We affirm.

## Facts[1] & Procedural History

Mother and Father have six children together. Though all of them were the subjects of the underlying CHINS proceedings, only the four youngest – M.F., born in April 2005; P.F., born in May 2008; L.F., born in November 2009; and D.F., born in February 2012 – are involved in this termination.

The Indiana Department of Child Services (DCS) became involved with the family after receiving an emergency report from local law enforcement on the evening of June 26, 2017. DCS case manager Dominique Geers responded to the home, where police had just made two drug-related arrests with the children present. Mother and Father were not initially present, and the report alleged

---

[1] Father's appellate brief contains a Statement of the Facts section which is devoid of nearly all relevant facts and is essentially just a recitation of the procedural history of the case. This is not proper, especially in a fact-sensitive case involving the termination of parental rights. Moreover, there is not one citation to the record in this section or the Statement of the Case section. Counsel is directed to closely review Ind. Appellate Rule 46(a) before filing another brief with this court.

neglect based on illegal substance use, lack of supervision, and poor home conditions. Geers spoke with Father and Mother after they individually arrived at the home. Mother admitted to using heroin the previous night, and she appeared to be under the influence at the time. Father was cooperative.

[5] Based on her investigation and after speaking with her supervisor, Geers decided not to detain the children that evening. She developed a safety plan with Mother and Father. Geers returned the next day and found the family cleaning up the home. The home conditions were improved. DCS continued to informally work with the family and provide drug screens.

[6] Thereafter, on August 14, 2017, DCS removed the six children from the home on an emergency basis due to Mother's and Father's illicit drug use, including methamphetamine and fentanyl. A CHINS petition was filed two days later. The children have never returned to Mother's and/or Father's care.

[7] DCS family case manager (FCM) Ethan Harriett worked with the family in August and September and met with Mother and Father to discuss services. Mother acknowledged using methamphetamine almost daily, but Father denied illegal drug use, despite having positive drug screens. Father, however, did participate in a substance abuse assessment and attend a couple of classes. He provided several clean drug screens in August and September, but also had positive screens in those months, as well as in October and November. On November 27, 2017, Father tested positive for cocaine, opiates, and fentanyl.

[8] At the CHINS factfinding hearing on January 11, 2018, Mother and Father (Parents), who were both in custody at the time, admitted that their six children were CHINS due to their illicit drug use and its effects on the children. By order dated February 8, 2018, the court adjudicated the children CHINS.

[9] The CHINS dispositional hearing was held on March 9, 2018, with a subsequent order issued on April 4, 2018. The court ordered Father to, among other things, keep all appointments with DCS and service providers, maintain stable and appropriate housing, secure and maintain a legal source of income, not use any illegal controlled substances, obey the law, engage in homebased casework, complete a parenting assessment and follow all recommendations, complete a substance abuse assessment and follow all recommendations, participate in a domestic violence assessment and follow all recommendations, and attend all scheduled visitations.

[10] FCM Khalid Fazly worked with the family from October 25, 2017 to January 14, 2019. FCM Fazly found Father to be initially compliant with some services, including drug screens and visitation, but unwilling to do other services. After the dispositional hearing, Father began having consistently positive drug screens for various illegal substances. On March 20, 2018, he tested positive for methamphetamine, THC, cocaine, opiates, and fentanyl. He continued to test positive in April, May, and June 2018, and then did not screen again for several months.

[11]     FCM Fazly made a number of service referrals, but service providers had difficulty contacting Father.  For example, FCM Fazly made referrals for Father to engage in homebased casework to assist him with obtaining stable housing, employment, and a driver's license.  The providers reached out to Father without success and the referrals were closed for noncompliance.  After Father became homeless around March 2018, he contacted FCM Fazly for help with housing.  FCM Fazly made a new referral for homebased services, and Father participated in only a couple sessions and then became noncompliant.  Similarly, although Father completed a parenting assessment, he did not follow through with the recommended follow-up.  He attended about half of the parenting sessions and, according to the service provider, "he was challenging at times" and "didn't really take it serious."  *Transcript* at 145.

[12]     Supervised visits proved to be very chaotic due to Mother and Father arguing in front of the children and Father being aggressive with providers and not following the rules.  Services providers believed that Parents were coming to visits under the influence, and there were instances when providers did not feel safe supervising the visits.  By June 2018, four different providers had dropped the family from visitation services.  On June 17, 2018, the trial court ordered the suspension of visitation.  Supervised visitation was reinstated by early November 2018.  At this time, DCS attempted unsuccessfully to find therapists for therapeutic visitation.

[13]     In the meantime, Father was arrested and charged in August 2018 with, among other things, Level 4 felony dealing in methamphetamine.  He obtained pretrial

release in October 2018 to reside in the Muncie Mission on GPS monitoring in Delaware County. About a month later, Father cut off his GPS monitor and absconded. He was charged with Level 6 felony escape and was on the run until December 18, 2018, when he was arrested. He remained in jail through about mid-August 2019, when he obtained pretrial release in his pending criminal cases. FCM Fazly met with Father in jail, as did the subsequent FCM Joiceann Janes, who took over the case in January 2019. Although aware of NA meetings available in the jail, Father failed to sign up to participate.

[14] At a permanency hearing on October 22, 2018, the court approved a concurrent plan of reunification and adoption. DCS then filed, on March 26, 2019, the instant termination petitions with respect to the parent-child relationships involving M.F., P.F., L.F., and D.F. At a CHINS hearing on May 13, 2019, the permanency plan changed to adoption.

[15] The termination factfinding hearing was held on July 24, August 21, and September 5, 2019. Before the second day of the hearing, Mother signed adoption consents and was dismissed from the case. The case proceeded with respect to Father.

[16] A number of service providers testified at the hearing and provided facts as set out above, detailing such things as DCS's involvement with the family, Father's lack of compliance with service providers, the chaotic nature of supervised visits due to the behavior of Parents, and Father's drug use and incarcerations. Additionally, evidence was presented that the children are in preadoptive

homes, with the three youngest in a foster home together, where they have been thriving for two years, and M.F. in kinship care.

[17] CASA Charla Hiatt testified that termination was in the best interests of the children. She noted that Father was inconsistent during visits and acted differently when using drugs. Even when Father was not incarcerated, CASA Hiatt testified that she did not see a lot of improvement in his ability to parent. She attributed that to his drug use and resulting lack of involvement in services. DCS tried to get Father into inpatient treatment for substance abuse, but CASA Hiatt testified that he refused and "wanted to do it on his own." *Id.* at 187. Additionally, she testified that Father did not cooperate with three different homebased service providers. Services were offered "[s]everal times" and Father did not take advantage of them. Finally, CASA Hiatt noted concerns regarding Father's various pending criminal cases. In recommending termination, CASA Hiatt stated:

> Two years of really tryin'. I mean I – I think we all really tried hard. [FCM Fazly], me, counsellors, homebased caseworkers, um- numerous of hours. We tried to get him to get help, and to go to counseling, and to work with the homebased caseworker, and it just never happened. And I think two years is a long time for those kids to be [in] limbo, and not knowin' what's gonna happen. Um- I just- I don't see him goin' ahead and doin' it.

*Id*. at 189-90.

[18] Similarly, FCM Janes testified that she believed termination was in the children's best interests. She summarized Father's noncompliance with the

dispositional order. In April 2019, FCM Janes met with Father in jail and discussed the available NA meetings, but Father did not participate in these while incarcerated over the next four months. Father met with FCM Janes upon his release from jail in August 2019 and requested visitation but no other services. He provided a clean drug screen on August 19, 2019, just days after being released, but then did not show up for a screen the next week. FCM testified that Father currently did not have suitable housing for the children or stable income and was facing criminal charges with a potential sentence of about twelve years in prison.

[19] Father testified and, for the most part, did not dispute the evidence presented by DCS. He acknowledged that since August 2017, he has not had stable housing, has worked less than three months, has been incarcerated for a total of about ten months, and did not comply with services even when not incarcerated. Father indicated that he had used illegal drugs, including methamphetamine, during the CHINS case and up until he went back to jail near the end of 2018. He also conceded that he "fell out of contact frequently" with DCS. *Id*. at 208. Father agreed that DCS had offered services throughout the case and that he did not take full advantage of the offered services. Regarding his present ability to care for the children, Father testified that he did not have a suitable home for them and could not "[r]ight this second" support them. *Id*. at 210. Father also acknowledged that he had pending criminal charges in multiple cases and was facing a possible sentence of twelve years in prison but that he believed he could "get it all plead out to a bunch of paper. I mean a lot of probation." *Id*. at 204.

Despite his "downward spiral" after the children were removed, Father testified that he was "back stable again" with a job lined up and Veteran's disability "right around the corner." *Id*. at 204-05.

[20] On January 6, 2020, the trial court issued detailed orders terminating Father's parental rights with respect to M.F., P.F., L.F., and D.F. Father now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[21] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[22] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for

the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[23]  Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2.

[24] On appeal, Father challenges only the trial court's conclusions with respect to I.C. § 31-35-2-4(b)(2)(B)(i) and (ii)[2] and, specifically, does not challenge the court's conclusions regarding the best interests of the children or whether there is a satisfactory plan following termination. We observe that I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive and, thus, requires the trial court to find only one of the three requirements of the subsection by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209. Though the trial court found two of the requirements satisfied in this case, we will focus our review on the trial court's determination that there is a reasonable probability that the conditions that resulted in the children's removal and/or continued placement outside Father's home will not be remedied.

> In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.

---

[2] The trial court made no determinations regarding subsection (iii), as that was not one of the bases for termination alleged by DCS in the termination petition.

> Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." [*McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003)]. In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

*In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (some citations omitted).

[25] Father makes a number of perplexing statements in support of his sufficiency argument on appeal. For example, he suggests that the children were removed from his and Mother's care due to poor living conditions, which were remedied the following day. On the contrary, the record makes clear that the children were not removed back in June 2017 when the first report of child neglect was received by DCS. Rather, the children were removed in August 2017 due to Parents' drug use, which negatively impacted their children. Further, Father suggests on appeal that he was working up until he became incarcerated, he "did his part in trying to find suitable housing", there is no evidence that his current housing is unsuitable for the children, DCS failed to provide Father with "services, support, and assistance" during the CHINS case, and Father "has clearly shown he is and has turned her [sic] life and situation around". *Id.* at 23, 24, 26. None of these assertions is supported by the record, let alone the evidence favorable to the judgment.

[26] Father's own testimony establishes that at the time of the termination hearing, he did not have a home in which the children could live, did not have stable income, and still faced multiple criminal charges, the most serious of which – Level 4 felony dealing in methamphetamine – could result in a lengthy prison term. Further, the CHINS case spanned more than two years, and in that time, Father failed to comply with the multitude of services provided him through DCS, including, among other things, parenting classes, homebased services, and drug treatment. After his children were removed in August 2017, he continued to use drugs – such as methamphetamine, cocaine, and fentanyl – up until he was incarcerated in late 2018, with only a relatively short period of clean screens at the beginning of the case. He also committed new crimes, including escape from home detention while on pretrial release. Upon his release from jail in August 2019, Father took one drug screen, which was negative, but then failed to come in for a screen the following week.

[27] We find fanciful Father's suggestion that he is now stable enough to care for his children after providing only one clean screen within days of being released from jail and with no appropriate housing or stable income and facing another potential incarceration. We have no doubt that Father loves his children and is bonded with them, but that alone, unfortunately, did not prove enough to cause him to actively engage in services when able to do so and to refrain from illegal activity. The evidence amply supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's removal and/or continued placement outside Father's home since August 2017 will not

be remedied due to his substance abuse, lack of stable housing, and inability to provide financially for the children. *Cf. K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643-44, 649 (Ind. 2015) (reversing termination where child was in relative placement and incarcerated father had voluntarily "made extensive efforts to better himself by learning parenting skills, addressing his problems with substance abuse, and establishing a bond with both of his children"; "there is seemingly nothing else Father could have been doing to demonstrate his dedication to obtaining reunification").

[28] Judgment affirmed.

Bailey, J. and Crone, J., concur.